## GOWEN *et al.* v. NEW ORLEANS NAVAL STORES COMPANY *et al.*

1. Where certain parties as heirs at law of a former owner of timber lands executed a lease thereto, and the consideration of the lease was a certain sum of money, which was very inconsiderable as compared with the real value of the property, and it appears from the uncontradicted evidence that the real consideration was that the lessee, by the bringing of a suit for injunction, would litigate with certain parties in possession of the land, and would pay all costs and expenses of such litigation, including costs, and that the lessee in the event of the successful issue of such suit should have the right to turpentine the timber on the land and the lessors should have the land, such a contract was champertous and void.

2. The proper practice, where the plaintiff fails to make out a prima facie case, and the defendant offers no proof, is to enter a judgment of nonsuit. In such a case, where a verdict for the defendant has been directed and no errors have occurred in the trial, the judgment will be affirmed with direction that the plaintiff have leave to vacate the verdict and substitute therefor a judgment of nonsuit when the remittitur is made the judgment of the court below.

No. 3717.  DECEMBER 13, 1923.

Equitable petition. Before Judge Summerall. Charlton superior court. March 7, 1923.

*A. S. McQueen* and *Wilson & Bennett,* for plaintiffs.

*S. C. Townsend, S. F. Memory,* and *Parks, Reed & Garrett,* for defendants.

Beck, P. J.  Gowen and Vickery brought their equitable petition against the New Orleans Naval Stores Company and J. M. Pineda, for injunction to restrain defendants from boxing, cupping, or working the pine timber on a certain designated lot of land. Subsequently Isham Aldridge came in, and, alleging that he was the warrantor of the defendants named in the petition, was on his own motion made a party defendant along with those named. In due course the case came on for trial before a jury; and when the evidence for the plaintiffs was closed the defendants moved the court to exclude from evidence a lease introduced by plaintiffs, on the ground that the lease was a champertous contract, illegal and void, and that it was shown to be void by the evidence of the plaintiffs. The court sustained the motion on the ground stated, and excluded the lease from evidence; and thereupon the defendants further moved the court, without having introduced any evidence on their part, to direct a verdict in their favor. This motion the court also sustained and directed a verdict accordingly. The plaintiffs filed their bill of exceptions, assigning error on the ruling of the court excluding the lease from evidence, and also on the order of the court directing a verdict for the defendants.

1.  "A contract which is against the policy of the law cannot be enforced; such are contracts tending to corrupt legislation or the judiciary, contracts in general in restraint of trade, contracts to evade or oppose the revenue laws of another country, wagering contracts, contracts of maintenance or champerty." Park's Ann. Code, § 4253.  In the case of *Meeks* v. *Dewberry, 57 Ga.* 263, it was said: "Our statute, Code, section 2750, declares that a contract against public policy cannot be enforced, and among such contracts it specifies, 'contracts of maintenance or champerty.' If this contract be champertous, then it cannot be enforced. Is it champertous? Our statutes give no definition of champerty. We must then go to the common law, or statute law of England before the revolution, to find its definition. It is the unlawful maintenance of a suit in consideration of a bargain to have a part of the thing in dispute, or some profit out of it, and the promise to pay the expenses or costs seems to be essential to constitute it. 4 Blackstone, 135; Chitty on Contracts, 584; Hawkins' Pleas of the Crown, 463. Accordingly, in 54 Georgia Reports, 288, in the case of *Moses* v. *Bagley & Sewell,* this court held a contract not champertous, because there

was no agreement to pay costs. Thereby we clearly implied that if there had been such a bargain we would have held differently. Here there is an express promise to pay costs; the thing to be done contemplated a suit, the promise was to maintain the suit free of costs to Dewberry, the defendant in execution was in bankruptcy, and a fee of $143.00 was actually paid to attorneys at law." And Judge Jackson, delivering the opinion of the court, added: "We cannot imagine a case of champerty if this be not one." And in the case of *Johnson* v. *Hilton, 96 Ga. 577 (23 S. E. 841),* it was said: "Where one who had no interest in, or title to, a lot of land, accepted a deed thereto from others, but paid nothing for the conveyance, and, in contemplation of litigation to be instituted by himself, agreed 'that if he realized anything from said lot he would pay them whatever was right, and if he did not gain anything he would pay all costs and expenses,' the deed was a champertous contract and therefore void." In the case of *Anderson* v. *Anderson, 12 Ga. App. 706 (78 S. E. 271),* the Georgia Court of Appeals held: "There are two essential elements in a champertous agreement. First, there must be an undertaking by one person to defray the expenses of the whole or a part of another's suit; and, second, an engagement or promise on the part of the latter to divide with the former the proceeds of the litigation in the event it proves successful."

Under the rulings made in the Georgia cases from which the above quotations are taken, the lease relied upon by the plaintiffs, which was essential to establish their right to recover, was champertous, and therefore illegal and void. The uncontroverted evidence introduced by the plaintiffs, when questioned in regard to the consideration of the lease, shows the champertous nature of the contract. It is unnecessary to consider the evidence tending to show title in the lessors of the plaintiffs in error. Conceding that the lessors had such title to and interest in the property leased as would convey a leasehold interest to the plaintiffs, the plaintiffs could take nothing under the lease in question if it was void, and it was void if champertous. As showing the champertous nature of the contract, we quote the following from the testimony introduced by the plaintiffs. Frank Murray, one of the lessors, testified: "I told Mr. Vickery [one of the plaintiffs who secured the lease] years ago how this property came down. . . He said he would

fight it out and see where the title stood. . . He said if we gained it that we could claim the land, and he would take a lease on the timber for his part. He would take the timber for his part in conducting the litigation. He said he would put up the money to fight it out, and if they did hold he would take the timber and we could take the land. He gave me $5.00. That is the only consideration he paid me for it, so far. He did promise us in the event we won out that all [the lessors] could have the land. He was to pay the expenses. That was to include lawyers' fees and court costs, if there were any. He was to pay everything." This witness further testified that at the time the witness executed the lease to the plaintiffs Mr. Vickery, one of the plaintiffs, told him the defendants' had a lease from Aldridge; but the witness knew at the time Aldridge went into possession that he, the witness, had an interest in the land.

Vickery himself testified in part as follows: "I had an agreement with them by which I was to pay the expense of litigating the title and they were to make a lease to this timber in addition to cash payments. I paid different prices to the other heirs. I paid some of them $5.00, and I paid some $10.00, whatever I could buy it for and whatever agreement I could make with each individual heir. I paid some $5.00 and some $10.00. The ones I could buy for $5.00 I got them for five; and if he insisted $10.00 I paid him ten. When I got to Waycross I consulted my lawyer, and he began the preparation of the suit. I went on getting the lease signed. I don't know whether he was preparing the suit at that time or not. He hadn't prepared it at that time. . . I told him I was expecting to need him. The day before I saw the boxes there I got some heirs signed in Florida. I already had a lease from some of the heirs at that time. I told him [plaintiff's counsel] to prepare the proceedings, and I went to Blackshear and got some heirs there to sign it. I think I got the heirs there to sign it before that. I came back and started to Camden County to get Frank to sign it, and met him there, and he signed the lease here. He had signed the agreement before. He signed the lease after I came back. The agreement was that I was to pay the attorney's fees and stand the expenses of litigating the title to this lot of land, and that in addition to the small cash consideration that I paid these heirs- that they were to make this lease to the.

timber to me in repayment for that, and that they were to have the land if I prevailed in the litigation. Of course, I couldn't convey the land, but I was going to litigate the title for them for the timber and what cash I paid them. They conveyed me their interest in the timber, and in consideration of that I was to furnish the money to litigate the title to the timber. Some seven or eight years ago, when I was operating a business at this site, I wrote Mr. Aldridge concerning the purchase of this timber on this same lot of land. I just wrote him, and he wrote me that he .didn't care to lease it; that I could go on it and work some old boxes on it if I wanted to, but he didn't want to lease the new timber. . . I told him then I would pay the expenses of the litigation that might come up as to the title to the timber, and if I won my title was good to the timber; that would necessarily make their title to the land good. Some five or six thousand boxes would be my estimate I would cut from this lot of land." From other parts of the evidence it appears that the amounts paid for the lease were very inconsiderable, you might say nominal, in comparison with the real value of the interest acquired under the lease. Clearly the real consideration of the lease was the engagement on the part of the lessees to litigate the claims of the defendants, which would, in case of a verdict in favor of the lessees, the plaintiffs in this case, establish the title of the lessors to the land. Comparing the facts thus adduced relatively to the consideration of the lease, we are of the opinion that the court below did not err in excluding the lease from evidence. With the lease excluded from evidence, there was no basis for a recovery on the part of the plaintiffs.

2. While under the evidence submitted by the plaintiffs, the lease having been excluded, a prima facie case was not made for recovery, the court should not have directed a verdict .for the defendants. "The proper practice, where the plaintiff fails to make out a prima facie case and the defendant offers no proof, is to enter a judgment of nonsuit." *Zipperer* v. *Savannah*, 128 *Ga.* 135 (57 S. E. 311) ; *Williams* v. *Perry*, 136 *Ga.* 453 (71 S. E. 886). Our attention is called, in the brief of counsel for defendants in error, to the case of *Thompson* v. *Etowah Iron Co.*, 91 *Ga.* 538 (17 S. E. 663), where it is ruled that "Where the plaintiff fails to make out a case, and the presiding judge, after so deciding, announces. that he intends to direct a verdict for the defendant, thus giving the

plaintiff an opportunity to take a nonsuit or dismiss his petition, neither of which is done, and the case is then disposed of by directing a verdict, there is no error." The question we are deciding falls rather within the *Zipperer* and *Williams* cases, supra, than within the ruling made in the *Thompson* case, inasmuch as the latter case turned upon the fact that the court announced that he "intended to direct a verdict for the defendant," thus giving plaintiffs the option of taking a nonsuit or dismissing the petition; but in the present case no such announcement was made, and it does not positively appear that an opportunity to dismiss or take a nonsuit was given plaintiffs. We therefore rule, as was ruled in the other cases, that the judgment will be affirmed with direction that the plaintiffs in error have leave to vacate the verdict and substitute therefor a judgment of nonsuit when the remittitur is made the judgment of the court below.

*Judgment affirmed, with direction. All the Justices concur, except Russell, C. J., dissenting.*